**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

BOND PHARMACY, INC., D/B/A
ADVANCED INFUSION SOLUTIONS,

          Plaintiff,

v.

AETNA, INC.,

          Defendant.

Case No: 3:26-cv-317-CWR-LGI

## COMPLAINT

Plaintiff Bond Pharmacy, Inc., d/b/a Advanced Infusion Solutions ("AIS"), brings this Complaint against Defendant Aetna, Inc. ("Aetna"), and alleges as follows:

## INTRODUCTION

1.      This is a straightforward dispute in which Aetna has refused to reimburse AIS for the critical care it has provided to some of the most vulnerable patient populations in the country – patients for whom Aetna collects premiums to cover their medical needs.

2.      AIS is a Mississippi-based pharmacy and leading national provider of specialized home infusion therapy services ("HIT").

3.      These services allow patients suffering severe conditions, like multiple sclerosis, to receive custom medications through surgically-implanted "pain pumps" that deliver targeted relief daily over several months without being refilled.  These patients, who are largely ambulatory, may go on with their daily lives while receiving vital treatment.  In many cases these patients have tried multiple other options, and this is the only remaining option that allows them to be ambulatory.

4.      In 2009, AIS began providing services to Aetna's patients.

{D2578254.1}

-1-

5. Consistent with federal law and Aetna's billing policies, AIS billed for its services under Code S9328. And for years, Aetna paid AIS's properly billed claims without question.

6. But in early 2026, Aetna suddenly began refusing to pay AIS's claims, instead sending AIS recoupment notices and asserting Code S9328 was "excluded" from its members' plans.

7. AIS attempted repeatedly to confer with Aetna to discover why Aetna was demanding recoupment of its claims – without even denying any – and denying new claims, but Aetna's employees would not (or could not) explain Aetna's abrupt policy shift to AIS.

8. Nor would Aetna's leadership meet with AIS. Instead, for months when AIS repeatedly sought to schedule a call with Aetna to discuss its recoupment demands, Aetna refused to do so, using all sorts of delaying tactics including allegedly needing months of time to research and come up-to-speed on the thousands of pages of demands it had sent AIS.

9. To be clear, Aetna's efforts to avoid paying AIS have nothing to do with care for its members.

10. Instead, it appears to be a calculated and cynical move by Aetna to avoid paying providers for valuable care already provided to its members and thereby reap windfall profits.

11. All the while, and despite Aetna's refusal to pay AIS, AIS has continued to provide care to Aetna's members because they have no other realistic alternative for the same quality of care and therapy that AIS provides them. AIS provides this care pursuant to prescriptions issued by licensed practitioners.

12. As a result, AIS brings this Complaint to obtain relief for the substantial harm caused by Aetna's willful refusal to pay AIS for critical care provided to the most vulnerable and sickest patient populations.

## PARTIES

13.     Plaintiff AIS is a licensed specialty pharmacy and leading provider of intrathecal HIT and related services, including care management, patient training, administrative services, billing services, and around the clock patient support.

14.     AIS is incorporated under the laws of the State of Mississippi and has its principal place of business at 623 Highland Colony Parkway, Suite 100, Ridgeland, Mississippi 39157.

15.     Defendant Aetna is a national private health insurance company.

16.     Aetna, Inc., is incorporated under the laws of the State of Connecticut.  Upon information and belief, its principal place of business is 151 Farmington Ave., Hartford CT 06156.

17.     Additionally, upon information and belief, the claims for which Aetna seeks repayment were all paid by Aetna, Inc., for years.

## JURISDICTION AND VENUE

18.     The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties.

19.     For purposes of diversity jurisdiction, a corporation is a citizen of the State in which it is incorporated and has its principal place of business.  *See* 28 U.S.C. § 1332(c)(1).

20.     AIS is a citizen of Mississippi because it is incorporated in and has its principal place of business there.

21.     Aetna is a citizen of Connecticut because it is incorporated in and has its principal place of business there.

22.     The parties are therefore diverse for jurisdictional purposes.

23.     The amount in controversy also far exceeds the sum or value of $75,000.  *See* 28 U.S.C. § 1332(a).

24.     Aetna has wrongfully sought to recoup more than $2.8 million in alleged overpayments from AIS.  Aetna has also wrongfully refused to pay AIS for care and services totaling over $6.9 million.

25.     Aetna is subject to the personal jurisdiction of this Court.  Aetna's patients have enjoyed the benefits of AIS's medications and services, and until recently, Aetna has paid AIS. The medications AIS provides are compounded in Mississippi.  Additionally, some of the patients whose claims are at issue are Mississippi residents.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to AIS's claims against Aetna occurred in this District, and the property at issue is located in Mississippi.  Among other things, Aetna is seeking to recoup money paid to AIS in Mississippi.

## FACTUAL ALLEGATIONS

### *AIS Provides Specialized Intrathecal HIT*

27.     AIS is a specialty pharmacy and healthcare provider that offers specialty HIT and related services.

28.     It is licensed in and cares for patients across the Unites States.

29.     HIT involves the creation, dispensing, and infusing of materials by parenteral means.[1]

30.     Under this therapy, a patient's pump is refilled in a doctor's office or clinic, after which the patient returns home – as opposed to an inpatient, hospital setting – to resume his or her

---

[1]  NHIA, *About Home and Alternate Site Infusion*, https://nhia.org/about-infusion-therapy/ (last visited May 4, 2026).

normal lifestyle and work activities.  The pump releases a programmed amount of medication into the patient's body on a daily (*i.e.*, per diem) basis.

31.      If this therapy were not available, these patients would either take oral opioids (and be exposed to their potentially devastating side effects and addiction risk) or eke out their days in a costly inpatient treatment facility.

32.      HIT is typically prescribed for patients who have serious and abiding illnesses, such as chronic pain resulting from cancer, multiple sclerosis, spinal cord injuries, or other debilitating conditions.

33.      HIT carries substantial and well-recognized benefits for patients and payors.

34.      By receiving treatment at home or other outpatient locations, patients are able to "resume normal lifestyles and work activities while recovering from illness."[2]

35.      And HIT is far less costly than inpatient treatment at a hospital or skilled nursing facility.

36.      Typically, an accredited and licensed pharmacy that is responsible for providing HIT actually provides a wide range of underlying and support services to administer specialty drugs and deliver needed care management services, and that is in addition to the actual medication that is supplied and any nursing time that is logged to fill the patient's pump.

37.      Unlike a standard retail pharmacy that dispenses mass-produced commercial medications, AIS customizes each patient's medication to account for specific dosage, strength, content, and sterility requirements.

---

[2] *Id.*

38.     AIS operates in a specialized area of HIT.  AIS develops and dispenses patient-specific medications at the direction of a patient's treating physician that are continuously infused via implanted intrathecal pumps.[3]

39.     The pumps are surgically implanted and filled with prescribed medication that the pump continuously infuses through a catheter to the patient's spinal column to provide ongoing care.

40.     Because AIS's medications are directly infused into a patient's spinal column, the compounded medication must be 100% sterile; any impurities can result in serious illness or even death.

41.     "Infusion" or "administration" refers to the continuous release of AIS's medication from a patient's pump into the patient's body.

42.     The infusion is separate and apart from the refilling of the pump with medication, which is done by a physician or nurse.

43.     "Dispensing" is the delivery of the custom medication to the patient.

44.     Intrathecal pumps can infuse the patient's medication daily for up to 180 days before needing to be refilled.  However, some pumps may need to be refilled on a more frequent basis depending on the specific medication and dose prescribed by the patient's physician.

45.     The pumps must always be filled with medications and cannot run dry.  Allowing a pump to run dry could lead to life-threatening complications for the patient, who relies on the continuous, daily supply of medication.  Additionally, discontinuing the medication therapy once

---

[3]  Mayfield Clinic, *Pain Pump (intrathecal drug pump)*, https://d3djccaurgtij4.cloudfront.net/pe-pain-pump.pdf  (last visited May 4, 2026).

an intrathecal pump has been implanted would require a second invasive surgical procedure to remove the pump from the patient.

46.     The medications used for intrathecal pumps must be specially prepared for each patient to remain sterile, stable, and infuse daily.

47.     Otherwise, the medication will not infuse properly and will undermine the patient's plan of care.

48.     AIS invests substantial capital and resources into making the highest quality medications for patients that will properly operate within their intrathecal pumps for extended periods of time.

49.     To produce medications that can be infused for up to 180 days, AIS must undertake costly and specialized processes.[4]

50.     Moreover, AIS develops its medication based on patient-specific care plans and conditions, which requires it to coordinate and communicate with a patient's treating physician on an ongoing basis.

51.     In addition to preparing bespoke medications, AIS also invests substantial resources to provide patients with around-the-clock care and services.

52.     That is because as soon as a patient receives AIS's medication, the patient is "on-service" with – that is, under the care of – AIS.

53.     The patient remains on-service for so long as the patient has access to AIS's medication through the patient's implanted pump.

---

[4]  AIS Healthcare, *About AIS Healthcare*, https://aiscaregroup.com/about/ (last visited May 4, 2026).

54.     And so long as a patient remains on-service, AIS has an ongoing responsibility to make sure the patient is always cared for while receiving its medications.

55.     To meet that ongoing responsibility, AIS provides patients with ongoing care and a range of available services, including but not limited to continuous patient monitoring, professional pharmacy services, care coordination, nursing services, billing and support services, and administrative services.

56.     These services are available to patients as desired or necessary for no additional charge.

57.     Among other services, AIS has a call-center that provides all patients and treating physicians with "24-7/365" telephone access to pharmacists and nurses for treatment and billing-related support.

58.     These costly around-the-clock services are critical to providing patient care.  While these patients are on AIS's medications, they also necessarily remain under its care as AIS remains responsible for the medication infused through the patients' surgically implanted pumps.

59.     AIS also employs a team of nurses who provide patient care and coordinate other patient support activities.

60.     AIS assumes care for a patient only at the direction of the treating physician.

61.     Typically, a treating physician will have the patient complete AIS's consent and financial responsibility forms, pursuant to which the patient agrees to receive AIS's therapy and services, pay AIS for any amounts not covered by insurance, and assign any benefits or payment to AIS that the patient may receive.

62.    To initiate AIS's care and services, a treating physician will first send AIS an order, or prescription, documenting the prescribed plan of care, including the patient-specific prescription composition and dosage.

63.    After receiving a physician order, AIS specialty trained pharmacists review the order and AIS pharmacy teams create the patients' specific medications and prepare a compounding record detailing the various processes, testing, and procedures used.

64.    AIS maintains a packing and shipping area where its employees, including pharmacists, conduct a final quality check of the medications and prepare them for shipment.

65.    AIS then "dispenses," or delivers, the patient's medication to his or her treating physician, and typically documents that event with a delivery ticket returned by the treating physician.

### Code S9328

66.    HIT services are billed in accordance with the per diem reimbursement model set forth by the Health Insurance Portability and Accountability Act ("HIPAA") under Code S9328.

67.    Code S9328 was developed by payors and the National Home Infusion Association ("NHIA") at the direction of the U.S. Department of Health and Human Services, and is further defined in industry standards published and maintained by the NHIA.[5]

68.    Under HIPAA regulations, Aetna is "required to accept" the definition and requirements of medical codes under the Healthcare Common Procedure Coding System ("HCPCS").[6]

---

[5] NHIA, *NHIA National Coding Standards For Home Infusion Claims Under HIPAA* (Jan. 2026), available at https://nhia.org/wp-content/uploads/2025/12/NHIA_Code_Std-2026.pdf (last visited May 5, 2026) (hereinafter "NHIA Standards").

[6] *Id.* at 5.

69.     The use of payor-specific codes deviating from HCPCS is "not allowed."[7]  Payors may not amend, condition, or change the code requirements.  To do so would be a HIPAA violation.

70.     Using HIT-specific billing codes, AIS bills a negotiated per diem each day a patient has "access" to its "prescribed therapy," that is, the medication.[8]  Nothing more is or can be required.  A patient has "access" each day the pump releases AIS medication into the patient's body.

71.     The per diem rate is intended to bundle, under one code, all of the many varied costs and expenses that HIT providers incur to develop the therapy and provide patient care and services.

72.     For patients with intrathecal pumps, the per diem applies each day the patient is on the pump and the pump infuses (or administers) the medication.[9]

73.     Consistent with the purpose of HIT to allow patients to go about their daily lives while receiving continuous treatment, there does not need to be a daily interaction between the HIT provider and patient for a per diem to apply.

74.     But the pharmacy provider still maintains "continued responsibility for the patient" and "incurs costs related to such responsibilities" while the patient is on service.[10]

75.     Code S9328 bundles multiple covered services into one per diem charge, meaning a provider may bill that code whenever it provides at least one of the covered services.

---

[7]  *Id.*

[8]  *Id.* at 95.

[9]  *Id.*

[10]  *Id.*

76.    Code S9328 includes "implanted pump pain management infusion," "administrative services, professional pharmacy services, care coordination, and all necessary supplies and equipment (drug and nursing visits coded separately), per diem."[11]

77.    A provider properly applies a per diem charge under Code S9328 whenever it provides one of the covered services.

78.    As such, AIS may bill Code S9328 each day a patient has access to the infusing medication.

79.    AIS may also bill the per diem for providing any one of the other listed covered services.[12]

80.    However, drug components (which are typically the raw materials, such as drug powders, used to develop the final medication) and any nursing or other services are billed separately and not covered by the per diem.[13]  This service/drug bill separation recognizes that patients received different medications with varying costs.

81.    The per diem is the only means by which AIS recovers the substantial costs necessary to develop a patient's custom medication and make a fair return.  Drug and nursing claims do not cover or relate to those costs.

82.    AIS bills drugs and nursing services separate and apart from the per diem and under different billing codes.

83.    So, in total, AIS bills for the cost of the compounded drug, the cost of any nursing services that are expended to fill the pump, and the per diem.  There is no duplication of payment.

---

[11]  *Id.* at 109 (emphasis added).

[12]  *Id.* at 95-101.

[13]  *Id.* at 102.

***Aetna's Policies***

84.    AIS began providing service to Aetna's patients in 2009 on a patient-by-patient basis.

85.    While AIS and Aetna did not agree to a provider agreement (and thus, AIS operated out of network), Aetna paid AIS's claims for years.  Aetna received the direct benefit of AIS's services to its members.

86.    Aetna's billing policies mirror HIPAA requirements and the NHIA Standards.

87.    Aetna has specifically authorized AIS to bill Code S9328 with no excluded services for its patients.

88.    Aetna's Provider Manual incorporates a Medical Clinical Policy Bulletin related to "Infusion Pumps."[14]

89.    That Policy Bulletin expressly provides for services billed under Code S9328 for intrathecal pump infusion:



90.    Aetna's policies are also reflected in the single case agreements Aetna entered with AIS related to certain patients and/ or certain services.

---

[14]    Aetna, *Medical Clinical Policy Bulletins*, *Infusion Pumps*, *available at* https://www.aetna.com/cpb/medical/data/100_199/0161.html (last visited May 4, 2026).

91.     Many of those agreements specifically provide for HIT per diems billed under Code S9328, as the following example illustrates:



92.     Consistent with Aetna's contracts and policies, AIS properly billed a daily per diem for its HIT medications, which were "administered" continuously.

93.     AIS also provided Aetna's members with access to ongoing care and additional HIT-related support and administrative services on a 24-7/365 basis.

94.     Additionally, AIS properly provided drugs and nursing services to Aetna's members.

95.     As a result, when Aetna previously analyzed AIS's billing under Code S9328 between April 2021 and June 2022, it determined AIS was properly billing the code.

96.     Thus, Aetna has approved and paid AIS's claims without issue for years in accordance with its own stated policies and agreements with AIS.

*Aetna Refuses To Pay AIS*

97.    Beginning with November 2025 Dates of Service, Aetna suddenly and inexplicably began refusing to pay AIS's claims and even sent overpayment demands of millions in past charges that it already paid to AIS.

98.    Between December 18, 2025, and February 9, 2026, AIS received numerous letters from Aetna asserting that Aetna had overpaid AIS on more than 7,700 claims billed under Code S9328.

99.    Aetna's overpayment demands asserted "[b]enefits were issued for services specifically excluded by member's plan," the plan "has an exclusion for S9328," and/ or "[a] separate allowance should not have been issued for S9328."

100.   AIS has not received denials for these claims.  Nor has Aetna been willing to provide AIS any basis for the supposed exclusions and non-payment despite its repeated requests.

101.   Indeed, when AIS called Aetna in an attempt to understand its overpayment requests, Aetna's employees were confused by the recoupment demands and could not explain their bases to AIS.

102.   Aetna employees also referenced various payment and pricing policies to AIS, but refused to provide copies of any of them to AIS.

103.   Nevertheless, Aetna's overpayment demands summarily assert Code S9328 services are "excluded."

104.   Additionally, in an attempt to resolve this dispute amicably, AIS offered for months to meet with Aetna.

105.   In April 2026, Aetna finally agreed to meet with AIS, but that is as far as its effort went. AIS attempted repeatedly to establish a date and time to meet. Aetna refused to do so,

asserting it needed weeks and weeks of more time to review the same recoupment demands it sent to AIS. Indeed, despite claiming that outside counsel was reviewing this issue, Aetna refused even to identify the counsel who would represent it in any meeting.

106. As of today, Aetna refuses to withdraw its overpayment demands, which total about $2.8 million, and has ceased paying AIS's S9328 claims, leaving a deficit of more than $6.9 million.

107. In refusing to pay AIS for the critical therapy AIS provides its patients – or even to talk to AIS about the basis of its recoupment notices and refusal to pay AIS – Aetna has acted with actual malice toward AIS, evincing a ruthless and cynical disregard for its rights. Aetna knows – and is banking on – the fact that AIS cannot and would not discontinue service to its patients, which could result in life-threatening complications for an extremely vulnerable population. As a result, by refusing to pay AIS, seeking recoupment without justification or even communication, and its endless stall tactics Aetna is reaping the rewards of AIS's therapy while intentionally forcing AIS to bear the entirety of the cost. Tellingly, Aetna has not noticed AIS of its plan to ensure continuity of care for its members on HIT therapy should AIS be unable to serve them.

108. Nor is there any good faith basis for Aetna to refuse to pay or seek to recoup AIS's claims. AIS and Aetna reviewed AIS's billing methodology under Code S9328 extensively between April 2021 and June 2022, and Aetna determined AIS was properly billing under that code. AIS's billing is further supported by the applicable authorities, including the NHIA Standards. And Aetna understood and agreed that AIS's per diem billing was proper, as evidenced by the fact that they paid AIS's claims for years. Nothing has changed in the years subsequent to Aetna's prior investigation into Code S9328. The billing of Code S9328 is recognized by the same

broad array of reputable authorities that convinced Aetna to pay the per diems in the past, and AIS has not changed its practices, service offerings or billing protocols at all.

109.    Aetna's bad faith constitutes an independent tort that entitles AIS to damages for anxiety, emotional distress, inconvenience, pecuniary loss, and expenses, including attorneys' fees.[15]

## CAUSES OF ACTION

### COUNT I
### (Unjust Enrichment)

110.    AIS realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 109 of this Complaint as if fully set forth herein.

111.    AIS has conferred substantial and valuable benefits on Aetna in the form of administering, dispensing, and/or providing critical HIT services to Aetna's members, which have benefited Aetna.

112.    AIS expended significant time and resources developing, delivering, dispensing, administering, and/or otherwise providing Aetna's members with home infusion therapy through the daily release of a prescribed medication from their pumps and related services with the intent of receiving compensation from Aetna.

113.    AIS continues to provide services to Aetna's members.

114.    Aetna has enjoyed the benefit of having access to AIS's services without compensating and reimbursing AIS for such services.

115.    Equity and good conscience require Aetna to compensate AIS for the substantial benefits AIS has conferred on it.

---

[15]  *Universal Life Ins. Co. v. Veasley*, 610 So.2d 290, 295 (Miss. 1992); *Garner v. Hickman,* 733 So.2d 191, 198 (Miss. 1999).

116. AIS is entitled to damages from Aetna, declaratory relief, and all other available remedies, as set forth in its Prayer for Relief.

117. Additionally, as explained above, in refusing to pay AIS for the critical therapy AIS provides its patients – or even to talk to AIS about the basis of its recoupment notices and refusal to pay AIS – Aetna has acted with actual malice toward AIS, evincing a ruthless and cynical disregard for its rights. AIS is therefore entitled to punitive damages from Aetna.

## COUNT II
### (Quantum Meruit)

118. AIS realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 109 of this Complaint as if fully set forth herein.

119. AIS provided Aetna with valuable services in the form of administering, dispensing, and/or providing critical HIT services to Aetna's members.

120. Aetna has accepted AIS's services and used them to its benefit, including to provide care to its members.

121. Aetna knew and expected AIS to charge for its services, in some cases negotiated rates with AIS, reviewed AIS's billing policies, and indeed paid AIS's claims for years until it suddenly stopped paying claims without justification.

122. AIS is entitled to damages from Aetna, declaratory relief, and all other available remedies, as set forth in its Prayer for Relief.

123. Additionally, as explained above, in refusing to pay AIS for the critical therapy AIS provides its patients – or even to talk to AIS about the basis of its recoupment notices – Aetna has acted with actual malice toward AIS, evincing a ruthless and cynical disregard for its rights. AIS is therefore entitled to punitive damages from Aetna.

## COUNT III
### (Bad Faith Refusal To Pay Insurance Claim)

124.    AIS realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 109 of this Complaint as if fully set forth herein.

125.    Mississippi law imposes on insurers like Aetna a duty to perform a prompt and adequate investigation and make a reasonable, good faith decision of whether to pay or deny a claim.

126.    Yet Aetna has acted in bad faith by denying AIS's claims and seeking recoupment of others without an arguable or legitimate basis, either in fact or law.  They did this having already thoroughly researched the per diem issue several years ago at which time they were convinced by the authorities that AIS' billing practices were appropriate.  Nothing had changed in the interim, and when AIS repeatedly pressed Aetna to schedule a call so the parties could work out their differences, Aetna literally stalled any such efforts to have a conversation.

127.    As explained above, Aetna has acted with actual malice or gross negligence toward AIS, evincing a ruthless and cynical disregard for its rights.  Aetna has refused to articulate any basis, let alone a reasonable one, for seeking to recoup or refusing to pay AIS's claims – or for refusing to speak to AIS at all.  Yet Aetna knows AIS's claims are properly billed because Aetna previously examined AIS's billing, determined it was correct and appropriate and complied with industry standards like the NHIA Standards, and paid AIS's claims for years.

128.    AIS is entitled to damages and punitive damages from Aetna, declaratory relief, and all other available remedies, as set forth in its Prayer for Relief.

## COUNT IV
### (Declaratory Judgment Pursuant To 28 U.S.C. § 2201)

129.    AIS realleges and incorporates by reference the allegations set forth in Paragraphs 1 through 109 of this Complaint as if fully set forth herein.

130.    An actual and justiciable controversy exists concerning whether Aetna has wrongfully refused to pay AIS amounts owed to it for care and services provided to Aetna's members.

131.    AIS alleges that it is entitled to payment for the services and care it has provided Aetna's members on an out-of-network basis, while Aetna asserts that it is not obligated to pay AIS's claims, has refused to do so, and has issued AIS overpayment demands.

132.    Pursuant to 28 U.S.C. § 2201, a judicial determination of the respective rights of the parties is necessary and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, AIS demands a trial by jury in this action on all issues so triable as of right.

## PRAYER FOR RELIEF

WHEREFORE, AIS prays for this Court to enter judgment against Aetna, granting the following relief:

1.    Declarations that:

- Aetna has been unjustly enriched at the expense of AIS on account of Aetna's members receiving intrathecal HIT services without compensating AIS;

- AIS is entitled to payment for out of network claims billed under Code S9328;

2.    Actual damages in an amount according to proof;

3.   Damages for pecuniary loss, expenses, costs, and attorney's fees related to this lawsuit;

4.   Punitive damages;

5.   Pre-judgment and post-judgment and other interest on all monetary damages, as permitted by law; and

6.   Any and all such further relief that the Court deems just and proper.

Respectfully submitted,

Dated:  May 5, 2026

**DANIEL COKER**

*s/Wilton V. Byars III*
Wilton V. Byars III – MSB No. 9335
wbyars@danielcoker.com
265 North Lamar Blvd. Suite R
Oxford, MS 38655
T:  (662) 236-8726

**KING & SPALDING LLP**
Jonathan Shin (*pro hac vice to be submitted)*
jshin@kslaw.com
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
T: (213) 443-4330

{D2578254.1}                                         -20-